RENDERED: JUNE 17, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-1319-ME

JULINA MARIE WINLAND                                    APPELLANT

v.
                    APPEAL FROM HARLAN CIRCUIT COURT
                    HONORABLE KENT HENDRICKSON, JUDGE
                    ACTION NO. 21-D-00184-002

EDWIN ALAN WINLAND, JR.                                 APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CETRULO, LAMBERT, AND McNEILL, JUDGES.

LAMBERT, JUDGE: Julina Marie Winland (Julina) has appealed from the order

of the Harlan Circuit Court denying her petition for a domestic violence order

(DVO) against her husband, Edwin Alan Winland, Jr. (Alan). We affirm.

Julina filed a petition for an order of protection on September 27,

2021, seeking protection against Alan, with whom she was involved in a

dissolution action and custody dispute.  She stated that on September 21, 2021,[1] in

Harlan County, Alan had engaged in an act of domestic violence and abuse based

upon the following allegations:

> I went to court because my soon to be ex-husband is
> trying to give custody of our children to my father.  At
> the lunch recess, Alan waited outside the courthouse and
> followed me and Kevin Lucas to our lawyer's office,
> Howard Law.  After we went inside, the secretary told
> me he was walking around my Yukon with an older man
> and asked who he was.  I told him that was my soon to be
> ex-husband.  Alan also tried to take Kevin and me to
> lunch.  We declined.  After court, I was given permission
> to see my kids for the first time.  I went up to my dad's
> house to visit with them.  Alan came in but then said he
> had to go and left in his car.  I got ready to go and one of
> my girls went to go get me Kevin's hitch that Alan stole
> off the Yukon.  My oldest son refused to give it to me
> and Alan came back so he gave it to him in his car after
> disobeying my dad to give it to me.  I jumped in Alan's
> car and he then took off.  I told him to give me the hitch
> and let me out.  He would not stop the car after I
> repeatedly told him to let me out.  He would not stop the
> car but said I could jump out so I opened the door.  He
> continued to drive down Ivy Hill and slid to a stop into
> the guardrail at the bottom.  I got the hitch and my foot
> got caught when the door hit the rail.  I pulled my foot in
> and he took off again.  I told him to let me out and he
> slowed down enough and told me to get out so I jumped
> out of the car.  I walked to my brother's house and he
> drove me up the hill.  Alan was parked behind my Yukon
> and tried to take the hitch back.  I rolled up the windows
> and locked the doors.  He said he would follow me.  He
> followed me down the hill so I pulled into the police
> station because he wouldn't leave me alone.

---

[1] Julina testified at the DVO hearing that the incident took place on September 20, 2021, and that
she listed the date as the 21st in her petition by accident.

Julina also sought an emergency protective order (EPO) that would restrain Alan from further acts of domestic violence and abuse. The circuit court issued an EPO and summons for a DVO hearing the following day. A DVO hearing was scheduled for November after Alan's counsel accepted service on his behalf.

The circuit court held the DVO hearing on November 5, 2021. Harlan Police Department Officer Jared Powell testified first. He came into contact with Julina and Alan when he received a call from dispatch regarding two people at the police department who had been arguing. Officer Powell returned to the police department and separately spoke with both Julina and Alan. Alan told Officer Powell that they had been arguing and that he was only there for his credit cards, which Julina refused to give to him. Officer Powell then spoke with Julina, who told him that Alan had taken her and would not stop his vehicle or let her out. She then tried to get out of the vehicle and it wrecked. Julina recorded everything that had happened in the car (Alan driving down the road and not letting her out), and she provided this to Officer Powell. Officer Powell charged Alan with unlawful imprisonment because Julina repeatedly asked to be let out of the car and he would not let her out. Julina was injured when she opened the door while it was going down the road. When Alan hit the guardrail, the car door came back and hit Julina's foot. He believed Alan told Julina she could jump out of the car.

During Officer Powell's direct examination, the Uniform Citation charging Alan with second-degree unlawful imprisonment was introduced as an exhibit. The citation, dated September 20, 2021, stated:

> On 9/20/2021 I received a call from dispatch of two individuals at the police station in reference to a verbal argument taking place. Upon arrival I spoke with [Alan] Winland. I asked what was going on. [Alan] advised that he was only there to get credit cards. That his wife Julina Winland had them in their vehicle and would not give them back that they were going through a divorce and having custody issues. Upon speaking with Julina Winland she advised that she could not get a divorce and other problems going on. She advised that her foot was hurting because she had jumped in the vehicle with [Alan] her husband's car and as they drove off she advised and has recording of yelling "let me out of the vehicle, stop the vehicle, let me out of the vehicle, let me out." [Alan] advised her to jump out of the vehicle and had failed to slow down. Julina had opened the door and continuing to try to get [Alan] to stop the vehicle and he would not. While the car door was open [Alan] had advised that he lost control on the road and hit the guard rail. The door of the car hit the guard rail slamming back and hitting Julina's foot.

On cross-examination, Officer Powell testified that Julina had gotten into Alan's vehicle due to a dispute over a trailer hitch. He also agreed that there were discrepancies as to how Julina told him she injured her foot (when she got into the car or when the door hit her foot after the vehicle ran into the guardrail). Julina did not need any medical treatment for her foot injury. Officer Powell did

-4-

not have any information about why Julina was at the house or what happened up there.

Julina testified next. She was currently married to Alan. She described the events that led up to the incident. Julina had been at her father's house visiting with her children when a dispute with Alan arose over a trailer hitch that she believed Alan had stolen from her Yukon truck. The hitch belonged to her friend, Kevin Lucas. Her oldest son gave the hitch to Alan while he was in his vehicle. Julina got into the car to try to get the hitch from him. Alan started driving and told Julina he was taking her to another location. He would not let her out. Julina got the hitch away from his lap and told Alan to let her out of the vehicle multiple times. He repeatedly refused to do so. Going down Ivy Hill, Alan told her she could jump out so she opened the door and put her foot out. At the bottom of the hill, Alan slid into the guardrail, causing the door to shut on her foot, bruising it. She did not need any medical treatment for her foot. Julina then pulled her foot back inside of the vehicle and shut the door. Alan started driving again and would not let her out. He slowed down at a stop sign and told her she could get out. She jumped out with the hitch. He told her he was going back up the mountain to her father's house to take her Yukon. She carried the 40-pound hitch to her brother Jeremiah's house, and he gave her a ride back up the mountain to her father's house. When she got back to her father's house, she saw that Alan had

opened all of the doors of the Yukon and was videotaping it. Julina put the hitch into the Yukon, got inside, started it, and put up the windows. At that point, her son was throwing a fit. He was mad he had to go with Alan. She said Alan turned his car around and followed her. He would not let her leave without following her. That prompted her to go to the police department. She first spoke with Officer Powell, then a lieutenant came in and listened to her recording. Alan was arrested.

When asked if Alan's actions put her in fear of him, Julina stated that it made her question what he really wanted to do. She thought she needed protection if he kept following her and not letting her go where she wanted to go.

At the conclusion of the testimony, Alan moved to dismiss the petition because the evidence did not establish that any domestic violence had occurred. The dispute was brought about by Julina when she decided to get the hitch for Kevin. She caused this by jumping into Alan's car without permission. The court opted to hear Alan's witnesses.

Alan testified first. He told his version of what happened on September 20. Julina had been at her father's house visiting with her children. Alan was to leave that area for a certain amount of time while Julina was there for the visitation. Julina was there longer than she was supposed to be. He went back when he got a telephone call from his father-in-law asking him to return because the oldest child was being belligerent about the trailer hitch. Alan decided to leave

the property after his son passed him the trailer hitch through the driver's side window. He was going down the road three to five miles per hour. While it was moving, Julina opened the door to the vehicle and got in. Alan told her he was going to the police station. Julina stayed in the car and wrestled the trailer hitch from him while the vehicle was moving. The tires of Alan's vehicle lost traction at the end of the hill, and it slid into the guardrail. Julina asked to be let go once she got the trailer hitch from him. He told her he was going to the police department so the police could figure out to whom the hitch belonged. He had told her this even before she had gotten into the car. Alan denied hitting or injuring Julina in any way. Julina opened the door while the car was moving; he did not do that. Alan pled not guilty to the unlawful imprisonment charge.

On cross-examination, Alan said that he knew on September 20 that the hitch belonged to Kevin Lucas. Alan tried to take the hitch because it was damaging the vehicle that he (Alan) owned; he took the hitch off to prevent more damage. He admitted that he and Julina had agreed that she was to have the Yukon during their separation, and that this had been the agreement on September 20. He instructed the oldest child to keep the hitch away from Julina, which he agreed was not appropriate. The hitch had been taken off several weeks prior to this incident.

Mykal Ringstaff testified next. He is Julina's father, and he currently has custody of Julina and Alan's children. He agreed to give Julina a visitation the

same day they were in court for a separate DVO petition.[2]  Mr. Ringstaff testified about the hitch incident and that it had upset the children.  After the oldest child refused to give the hitch to Julina, Mr. Ringstaff called Alan to ask him to take that child away until Julina had finished the visit.  Alan came to pick up the child, which is when everything else happened.  On cross-examination, Mr. Ringstaff said he had been told the hitch belonged to Kevin Lucas, and he recalled the day Alan took it off the Yukon.  He did not know the hitch was at his residence.

The court questioned Alan about the hitch and asked how Kevin had access to the car.  Alan said that Julina had been living at Kevin's residence for the last several months with that car.  The court then asked Julina about her motivation for getting the hitch.  She said Alan had stolen it and that she was trying to retrieve it to return to its rightful owner.  It was the only hitch that pulled a trailer Kevin had.

At the conclusion of the hearing, the court went through the sequence of events leading to the filing of the petition.  That day, a DVO hearing had been held against Kevin Lucas, with whom Julina had been living.  The DVO was entered to keep him away from the children.  Later that day, Julina was permitted to visit with her children at Mr. Ringstaff's house.  The court found that the

---

[2] This is the DVO petition Mr. Ringstaff filed against Kevin (21-D-00148-001), the granting of which is the subject of the companion appeal of *Lucas v. Ringstaff*, No. 2021-CA-1154-ME, also being considered by this panel along with *Winland v. Ringstaff*, No. 2021-CA-1153-ME.

evidence was substantial that Julina went to Mr. Ringstaff's house to get the trailer hitch and that the chaos that ensued was prompted by her actions. Julina was trying to grab the trailer hitch from Alan in the car and opened the door. The court believed that Julina was "a bit out of control" and was probably upset about the result of the DVO ruling. The court relied upon Mr. Ringstaff's testimony that the oldest child did not want to give Julina the hitch and that he had called Alan to calm the child down. The court found that Julina had jumped into the car while it was moving. The court was convinced that this was a one-off occurrence that went crazy. The court found that Julina had caused the series of events and ultimately denied the petition for a DVO. A written order memorializing the oral ruling was entered November 8, 2021. This appeal now follows.

On appeal, Julina's sole argument is that the circuit court improperly blamed her for the domestic violence, as provocation cannot be used as a defense in domestic violence cases. Alan, on the other hand, argues that the circuit court did not abuse its discretion in dismissing her petition as there was no evidence that any domestic violence had occurred or that it would be likely to reoccur.

"Domestic violence and abuse" is defined in Kentucky Revised Statutes (KRS) 403.720(1) as "physical injury, serious physical injury, stalking, sexual abuse, strangulation, assault, or the infliction of fear of imminent physical injury, serious physical injury, sexual abuse, strangulation, or assault between

family members or members of an unmarried couple[.]" KRS 403.740(1), in turn, provides that "[f]ollowing a hearing ordered under KRS 403.730, if a court finds by a preponderance of the evidence that domestic violence and abuse has occurred and may again occur, the court may issue a domestic violence order[.]"

In *Williford v. Williford*, 583 S.W.3d 424, 427-28 (Ky. App. 2019) (footnote omitted), this Court explained the standards of proof and review in domestic violence cases:

> When we review a decision of the family court, "the test is not whether the appellate court would have decided it differently, but whether the findings of the family court are clearly erroneous, whether it applied the correct law, or whether it abused its discretion." *Coffman v. Rankin*, 260 S.W.3d 767, 770 (Ky. 2008) (quoting *B.C. v. B.T.*, 182 S.W.3d 213, 219-20 (Ky. App. 2005)).

> The preponderance of the evidence standard is met when sufficient evidence establishes that the petitioner is "more likely than not" to have been a victim of dating violence and abuse, sexual assault, or stalking. *See Baird v. Baird*, 234 S.W.3d 385, 387 (Ky. App. 2007) (applying the preponderance of the evidence standard in the context of the issuance of a domestic violence order).

> Additionally, [Kentucky Rules of Civil Procedure (CR)] 52.01 provides that a trial court's "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *See also Reichle v. Reichle*, 719 S.W.2d 442, 444 (Ky. 1986). Findings are not clearly erroneous if they are supported by substantial evidence. *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003). Substantial evidence is evidence of sufficient probative value that it permits a reasonable

mind to accept as adequate the factual determinations of the trial court. *Id.* A reviewing court must give due regard to the trial court's judgment as to the credibility of the witnesses. *Id.*

As we explained in *Clark v. Parrett*, 559 S.W.3d 872, 875 (Ky. App. 2018) (quoting *Gibson v. Campbell-Marletta*, 503 S.W.3d 186, 190 (Ky. App. 2016)), "'[o]ur review in this Court is not whether we would have decided the case differently, but rather whether the trial court's findings were clearly erroneous or an abuse of discretion.'"

We also recognize that "the family court is in the best position to judge the credibility of the witnesses and weigh the evidence presented." *Williford*, 583 S.W.3d at 429 (citing *Hohman v. Dery*, 371 S.W.3d 780, 783 (Ky. App. 2012)). And we are mindful that "[t]he domestic violence and abuse statutes are to be interpreted by the courts to allow victims to obtain protection against further violence and abuse." *Kingrey v. Whitlow*, 150 S.W.3d 67, 70 (Ky. App. 2004).

In the present case, even if we were to agree with Julina that the circuit court improperly blamed her for provoking Alan, she is still not entitled to a DVO as she failed to introduce any evidence that domestic violence and abuse may again occur pursuant to KRS 403.740(1). The circuit court specifically found on the record that this episode was a one-time occurrence. Julina has not disputed this finding in her appeal. And she is required to introduce evidence that domestic

-11-

violence and abuse may occur again before the circuit court may grant her petition. In her brief, Julina states that she was clearly a victim of domestic violence "and was likely to be so again." However, she does not point to anything in the record to establish a threat of future harm. Accordingly, we must hold that the circuit court did not abuse its discretion in denying Julina's petition for a DVO.

For the foregoing reasons, the order dismissing Julina's petition for a domestic violence order is affirmed.

ALL CONCUR.


BRIEFS FOR APPELLANT:

Danny Lee Lunsford, Jr.
Harlan, Kentucky

BRIEF FOR APPELLEE:

Otis Doan, Jr.
Harlan, Kentucky